Next we have United States of America v. Cathedral Henderson We'll wait just a moment until the quorum is all set. So we can give you our full attention. Of course. I need your full attention. I need your help. I can't help either one of you. Oh, yes you can. Yes you can. You may proceed, counsel. Thank you, Judge. Bruce Harvey here for Cathedral Henderson. Mr. Henderson was a V.A. employee back in February of 2014 in Augusta at the Augusta V.A. Hospital. In May of 2013, the V.A. was... So, counsel, sorry to interrupt, but just so you know, and you can spend your time however you choose, we've all read the facts and the briefs and we're very familiar with the documents in this case. But you can spend your time however you wish. All right. So what questions do you have then? I think that I am here to try to parse through this particular record that you have told me that you are familiar with in order to argue to you that Mr. Henderson had no intent to commit any crime, one. And two, if he made statements, they were not material sufficient to convict him under 1035 or 1001. Let me ask you about the materiality issue first. It seems like we would have to consider that under a plain error standard. Is there some reason that we wouldn't? It seemed like during the trial that you had stipulated that the only thing that was at issue was mens rea. Am I reading the record wrong? No, you are not reading the record wrong. However, I think that the materiality aspect of it comes under the general rubric of sufficiency of the evidence because the United States has to prove every element of the crime beyond a reasonable doubt. One of those elements in the sufficiency determination that you make after a Rule 29 motion, now Rule 29 motion in this case specifically dealt with intent, but the sufficiency of the evidence as a whole encompasses the materiality argument. So I would argue to you that just because the Rule 29 and the motion for new trial focused on intent, you still get to determine it not under the plain error rule, but under the sufficiency of the evidence rubric. Okay, so let's just for the moment assume that we... It's a very interesting theory and you might be right about that. But if we decide that we don't accept that theory, is there a case from our circuit or from the Supreme Court that would demonstrate that it was plain error here on the materiality issue? Well, other than reiterating the cases that were cited in the brief, I can't give you a direct citation on the materiality issue. Materiality is defined in somewhat of a general fashion. And I think it's like shoveling smoke, determining intent, that it's general. So you have to fit the facts into that. And I think that's what we tried to do in our brief, to say, look, this couldn't have been material because nobody could have relied upon it in making the decisions that they made. And that's the general test. So I think that it's a mixed question of fact in law. And under the facts of this case, you cannot find that there was a sufficiency of the evidence as to the materiality argument. And same thing with the intent argument. In this particular instance, and I know you're familiar with the facts, what we had here was a directive from the National VA. We've got to clean up these consults. And there was a VA policy in place that says you can only close out these consults by clinical definition. A clinician has got to close it out. Administration can't close it out. And I think the record is very clear on this, that there was nothing, nothing told to Mr. Henderson to say, boy, the National VA policy in this case does not apply. He wasn't part of any special training for these closures. How does that change the fact that he told the people that he was supervising to write either closed or- Services rendered. Yes. Or a veteran does not want the services. Exactly. Yeah, no, I understand that because that's what he understood. Pursuant to the emails that are in the record that the government introduced in this case, he vigorously objected to the procedure that he was told to implement. He said administrators cannot close consults. And that's what he said to his supervisor. And his supervisor wrote back in ambiguous terms and specifically said that, boy, these things, I'm not going to argue with you. I'm not going to argue with you. These are past consults prior to NVCC being implemented that were to be closed when the claim was processed for payment. That meant that the services were rendered. Documentation along with the claim received, bill processed, consult, that is the bottom line. And when asked, when asked specifically, the supervisor who wrote that email was asked, and this is at page 289 of the transcript, so he could have possibly misunderstood your instructions, right? Answer, yes. So even the person who wrote that email acknowledged that there was ambiguousness, not ambiguity, that would be a new word, in the instruction and that he could have misunderstood it. What about her email that said the consult files are in active slash pending slash scheduled status? They are not completed and closed. Well, wasn't that in February after this was done? February 20th? I believe it was before, but maybe I'm mistaken on that. I don't, I, it says, sure, I'm giving you files. They are not completed and closed. But then, then after that is when the email says these are the ones that need to be closed. There's no evidence that he was directed to say that the treatments have been rendered or the patient has refused. Isn't that correct? You're correct about that. There's no evidence that he was given any training as to the closure, the new closure proceedings. There's no evidence that he was told that the VA, that the general VA policy was not in effect. There's no evidence to show that he was told that there were new procedures in line and that, that administrators could close files. There's no evidence that he was told that. There's evidence that people got training and other supervisors got training, but not Mr. Henderson. Let me ask you before you sit down. Do we have jurisdiction to consider the sentencing argument in light of the Cartwright case? Okay, and good, good question. I wish I knew how to respond to the Cartwright case. You tell me what it says and I'll tell you why it doesn't apply. Well, my understanding is that Mr. Henderson did not file a notice of appeal following the district court's denial of his motion to reconsider on the sentencing issue and that the Cartwright case says that he would have had to do so. Well, he objected at sentencing, and he objected at sentencing to the enhancement. I don't think when he files a, does the Cartwright case say that if you objected at sentencing, you then can't file a notice of appeal? Or were we talking about timeliness for filing the notice of appeal? Because he did object. It was litigated at sentencing, so the issue is preserved, is it not? My understanding is it's the first one, that that's what Cartwright says. Even though he objected, he still would have had to file the notice of appeal to encompass the sentencing issue. Can I address that in a letter brief to you? You may. And I can tell you why the Cartwright case doesn't apply. A letter, a short one. Yeah, yeah, yeah, a letter brief, sure. All right, good. Actually, that's probably up to Judge Rosenbaum whether that's permissible. That's fine. That's absolutely fine. It was the generic you that I was interested in. Can you do it within a week? Yes, of course. And then if the government wants to respond, the government may have a week in response. And can we do it in five pages or fewer? All right. Oh, sure. Thank you. I bet the Cartwright case wasn't even five pages, was it? Thank you. Thank you. Mr. Stuchel. May it please the Court. Good morning, Your Honors. James Stuchel for the United States. The trial in this case lasted five days, and it consisted of a testimony of 45 witnesses and 122 exhibits. After hearing all that evidence, it took our jury a mere two hours to find Cathedral Henderson guilty on all 51 counts. The reason the Court could make that decision so readily is because our evidence was copious and persuasive on every essential element, and this Court should affirm for those very same reasons. On appeal, Mr. Henderson raises four arguments that amount to sufficiency of the evidence, but on not one of them has he shown an absence of evidence for any essential element for the government offered. Instead, he merely points to his countervailing evidence, which was less and weaker than ours, and asks this Court to reweigh it. That's inappropriate. May or may not have been less and weaker, but it wasn't accepted by the jury. Not at all, Your Honor. Not at all accepted, and to the extent there is a conflict in any factual evidence, then this Court has to give deference to the jury's factual findings. It has to infer that the jury made all findings in favor of the verdict, and to the extent that this Court wants to weigh the credibility of competing evidence, then it can only discount our evidence if it was a fact that the witness could not possibly have perceived or it's contrary to the laws of physics, and there's no such possible argument in this case. All the facts were about the VA policy, proper procedures, both before, during, and after the mandate. The best example of this comes in his argument that he lacked intent for either of the lies for which we convicted him. Our evidence of his intent was, frankly, overwhelming. He had to act knowingly and willfully for both the crimes with which we charged him. There's no question that he knew that telling a lie was a crime. He knew that because every time he logged on to the patient system, which he did thousands of times over five years, he encountered two warning screens that told him that misuse of the patient information, it can be a federal crime. He also attended annually two training sessions in the ethics and legality of operating the patient records on the system. So he definitely knew that the false statements he instructed his employees to use could be criminal. This is an unusual case because normally under the statute the situation would be that someone's doing something to defraud Medicare, for example, something that affects the taxpayers. Can you tell me how what Mr. Henderson did was material to the VA program as opposed to the patient care? And patient care may be sufficient, but assume for purposes of my question that it needs to affect the taxpayers, the federal program. Yes, that's a good question. We charged him for those first 50 counts under Section 1035, false statements in the context of health care. That statement makes it a crime if the defendant makes the false statement in connection with either the delivery of or payment for health care benefits. In this case, his false statements was material to both the delivery of and payment. Your question was premised on not on the clinical portion, but it was definitely material for the payment of health care services in three ways. First, he instructed the clerks to not do the required review of the patient record. So that materially influenced their decision. They otherwise would have done it. Now, as I remember, he thought, or he said he thought, that he thought his boss's email had instructed him that somebody else had already ascertained the status of these and he was really involved in the administrative act of simply closing them, that the due diligence had already been done. What was the government's answer to that? How did you rebut that? Yes. The assertion came from counsel because Mr. Henderson did not testify. So it's more argument than fact, Your Honor. Well, counsel is saying this is what the inference is from the facts, if you want. But still, you've got to answer it, it seems to me. Yes. I was going to get that. Thank you for pointing. Your Honor, the allegation that his supervisor, Mary Beth Bredehoft, instructed him to blanketly close all 2,700 because the services had already been rendered, it's frankly a distortion of the evidence. His claim is based on an email exchange between Henderson and Mary Beth Bredehoft. That's it. Right. That's at Volume 2 of the appendix. It was Government Trial Exhibit No. 6. I have it in my hand. The first email started from Mary Beth Bredehoft, the supervisor, on February 4, 2014. That's right in the midst of a cleanup mandate, and that's before he committed these crimes. And she instructed him. There's three sentences, and it just says three things. I'm not quoting, but the first sentence says that there are thousands of pending consults dating back to 2012, quote, that need action on them, unquote. She did not tell him that they were closed. She did not tell him the services were already rendered. And she told him they needed action, not automatic closure. The second sentence, she describes the proper procedure, and it's important to note that this is the same procedure before, during, and after the consult, the mandate process. She says, all along from the beginning, the consult was to be completed when the claim was processed and the document received, and that was not done. So that is not telling him that all these services were rendered. It's just telling him, reiterating the true process, which he already knew, because he followed it for the previous five years. Then the final sentence of her email asks him to review the, quote, to review these and close these out or appropriately mark them, unquote. She did not instruct him to close them all out. She said, do what needs to be done. Follow the proper procedure you've been following for the previous five years. Look through the file. If the claim was processed and the documents are received, then close them out. Otherwise, appropriately mark them. Mark them such as services not rendered, patient canceled, patient didn't attend any of the scheduled appointments, any of the other procedures. But she definitely did not instruct him to close them all out. I'd like to discuss the rest in the email chain, if I may. I mean, to this very clear instruction, Henderson simply responded that he only has 1.5 nurses working for him and that's not enough to do all these. She then responded that nurses are not responsible for closing out the consults. She then reiterates, again, the process he should have followed. The process was, quote, the deal was the consult gets closed when the claim is processed. And that was the process that was supposed to be in place since consult tracking came out. Again, she just reiterates the proper thing to do. In response, Henderson again says, I just don't have enough staff for it. And that's when she responds to the email that Henderson takes wholly out of context. And she says, these are past consults prior to NVCC, that's the current name of his division, being implemented that were to be closed when the claim was processed for payment. Unquote. Process for payment can only be done when a clerk gets into the patient record, sees that the outside provider has sent a bill for services or notes or if it's a request for radiology, the results of the picture, and then the clerk processes his bill for payment. So you can, the clerk would never know that happened unless and until he or she got into the patient record, which is what he instructed them not to do. Another arrow in the defendant's quiver is that he argued that he knew that these, he was under the misapprehension perhaps, but it was his belief that any consult that had been ordered in a past fiscal year could not be satisfied during the current fiscal year. And so there was no real harm in closing out past fiscal year consults. Now, he may have been under a misapprehension with respect to that, but we're dealing here with a Sienta issue and the question of whether he willfully did this or not. What was the government's evidence contrary to that? Your Honor, the evidence was uncontradicted that throughout this process, the consults did not expire. We know that definitively because Cathedral Henderson himself, for the previous five years before these crimes, closed out personally over 700 pending consults according to the proper procedure, and a handful of them were from prior fiscal years. That's outside the current fiscal year. That's our testimony of Witness Shayla Desir. The transcript page is 551 to 552. Before the whole mess started, he himself closed out consults that were more than one year old. We don't need any more evidence than that, but I have it. I have it nevertheless because all our major VA witnesses testified that from the outset, the purpose of the mandate was to tackle open consults that had been open for more than 90 days, but as long as five years. If the consults automatically expired after one year, then why would the VA tackle them for five years old? It would have been much easier, much more conducive to the cleanup to automatically close anything over one year old, but that's not what they did. They did close those over five years just on the presumption that that was no longer medically necessary, but they specifically instructed every person throughout every VA facility in the whole country to tackle open consults as old as five years. At another point, he also argues that the consult expired after 60 days. Again, that's incorrect. He's confusing the consult with the authorization. Under the standard VA process, a doctor perceives a need for his patient that can only be fulfilled with outside services. The doctor creates the consult. Then a nurse goes in and creates an authorization, and that authorization to pay is an authorization for VA to pay once the services are rendered. And the evidence that we have, we've introduced dozens of consults, copies of consults into the record. They all show at the very bottom that the authorization expires after 60 days, but not the underlying consult. You know, even if that were true, I mean, it's not true that the consults expired, but even if it were, then his lies were still material, because they influenced the VMAC from issuing a new consult. If they had done the proper review, opened the record, seen the patient, never got the services, then they would have forwarded it to a doctor who could have issued a new consult so that the patient, he or she, could finally get the important services. What about his argument that no one would have relied on the statement that they put in the files in closing them? Oh, that's, we just proved that so many times. I mean, with many of his own witnesses, it was material. Well, first, we don't have to show reliance. It has to be materiality. That's kind of a low standard. We just have to show that the false statement was capable of influencing a decision of the VAMC. And we did that multiple ways. First, we did it, it influenced the decisions of the administrative workers in at least three ways. First, it prevented them from reviewing the file, which, of course, was standard operating procedure. It also prevented them from contacting the patient. Another procedure was if the file didn't show that the services were rendered, the clerk could call the patient and ask him or her and discuss it. So his fault, so it totally eliminated the ability of the clerks to do that. Excuse me. It also eliminated their ability to forward the opening consult to the attending physician. Remember, that was the whole point of the cleanup mandate. We had 2.1 million open consults, and the concern was a lot of brave veterans weren't getting the important care. And so the idea was to clean up all those that were no longer valid so that the VA physicians could focus on those that still needed the care. And his lie prevented that from happening here. If the clerks had done what they were supposed to and looked through the file and seen that the patient had not received the services, then under the explicit terms of the mandate, the clerk was to forward the open consult back to the initial physician for further review. And so this whole process short-circuited all that. It influenced clerks in those three ways. It also influenced the subsequent physician's decision, Your Honor. It would delay the physician's ability to give the patient the care he or she needed, the medical necessity that prompted the physician to enter the consult in the first place. His lies were material all over the place. Almost every witness testified, even some of his own witnesses who testified on his behalf. We showed them a copy of the language that he instructed the revenue clerks to issue, and they looked aghast at it. They said, my, this is bad. This doesn't make any sense. The only other argument I'd like to address is the claim that VA policy required medical people to close consults. Again, I mean, that's never been the case. It couldn't possibly be the case because Henderson himself closed them for five years prior to committing these crimes. He supervised the four fee division clerks, who were not medical personnel, who closed consults every day as a routine part of their duties. Does the Court have any other questions? Respectfully ask the Court to affirm. Thank you. Thank you, Counsel. We certainly are conflating administratively closing a file from its counterpart is that it's clinically closed. Now you can bill. Mr. Henderson was a biller. Closing the file, closing the consults required, and the record is extremely clear on that, that it was VA policy as follows, and I quote, and this is at page 248 of the transcript to 249, quote, non-VA consults should not be administratively closed without an appropriate clinical review. That was the policy. Nobody, nobody ever told Mr. Henderson that, okay, now we can administratively close these files. That's why, and I think the government is being a little bit disingenuous with the content of the emails, that's why he writes back to his boss, consults are clinical, Mary Beth, and have no impact to claim processing. You have given us not enough staff. You've given us a task to do the EMLs, which is a different task. We're busy doing that, and we can't administratively close these. No one, no one said, okay, we're going to change the rules for this, for this backlog, and I am going to tell you that you can administratively close files. He gave those clearly ambiguous instructions because even every one of the government's witnesses said, we don't understand the wording on the closures. Service is rendered or the veteran refused the service. It's clearly contradictory, and we just don't understand it. So that couldn't have confused or contributed materially to anyone's decision making. Indeed, everybody that testified said, boy, that was confusing. We'd have to follow up on that, and that's precisely what happened. And the government seems to want to lay the lack of immediate care at the feet of Cathedral Henderson. You know, this case investigation was in 2014, and the government brought in witnesses in 2016 to say, you know, I didn't get this treatment yet. They knew it in 2014. These files were reviewed in 2014. So the VA is saying, we waited two years so that these witnesses could come in here and say, I haven't gotten the treatment, but we didn't treat them anyhow. I mean, as bad as that is, how does that help your client? Well, because the argument that it, whatever he put, Mr. Henderson put on these files. Didn't have an effect. Yes, that's correct. Exactly. That's how it helps my client or Mr. Henderson. Secondly, you know, the prior files that he closed, he closed them administratively. He did his job. That in no way, shape, form or fashion shows that he had the authority to make clinical decisions and that the files were closed because fees were paid and clinicians said you can close the files. So I think that's another red herring. When they say, boy, he closed a bunch of files beforehand. Yes, he did his job. He did what he was supposed to do. He followed policy and that policy was they couldn't be closed administratively without criminal clinical review. So the delay is not attributed to him. He closed file, closed prior files, but that didn't have anything to do with anything. And, you know, he and the record shows that his instructions were only to review aging consults. And that's the testimony of Vicky Dunn at page 157. Only those in the last fiscal year. That's at page 157. And the last fiscal year was 10-1-2012 to 9-30-2013. Plus the testimony in the case in my last 15 seconds on page 711 and 712 from witness Georgietta Alston. Most of the consults that I worked on, if the patient hadn't been seen, the consult was already expired. These were expired, aged consults that were closed with an ambiguous statement. And the evidence of Mr. Henderson's intent simply is not apparent from the record. And you have the right and authority to say it ain't there. Reverse it. Thank you. Thank you, counsel. All right.